IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | Civil Case No.  1:26-cv- 1679 |
| 106.84634525 ETH AND 72,744.25201403 NEXO | ) | |
| FROM THE | ) | |
| CRYPTOCURRENCY WALLET ADDRESS | ) | |
| IDENITIFED  BY | ) | |
| 0x9b46ca799a1a005168e33a16a03376166209cd86 | ) | |
| HOSTED BY NEXO  CAPITAL | ) | |
| | ) | |
| | ) | |
| Defendants *in Rem.* | ) | |

**COMPLAINT FOR FORFEITURE IN REM**

COMES NOW the plaintiff, United States of America, by and through its counsel, Todd W.

Blanche, Acting Attorney General and by Annie Zanobini, Assistant United States Attorney, and brings

this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of

Civil Procedure:

**NATURE OF THE ACTION**

1.      The United States brings this action *in rem* seeking the forfeiture of all right, title and

interest in the 106.84634525 ETH and 72,744.25201403 NEXO from the cryptocurrency wallet address

identified by 0x9b46ca799a1a005168e33a16a03376166209cd86, hosted by Nexo Capital involving

violations of 18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering) and 18 U.S.C. § 1343 (wire

fraud).  The Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. §§

981(a)(1)(A) and (a)(1)(C).

## THE DEFENDANTS IN REM

3.      Defendant 106.84634525 ETH from the cryptocurrency address identified by 0x9b46ca799a1a005168e33a16a03376166209cd86 hosted by Nexo Capital is presently frozen and in the custody of Nexo Capital, a cryptocurrency exchange based in the Cayman Islands.

4.      Defendant 72,744.25201403 NEXO from the cryptocurrency address identified by 0x9b46ca799a1a005168e33a16a03376166209cd86 hosted by Nexo Capital is presently frozen and in the custody of Nexo Capital, a cryptocurrency exchange based in the Cayman Islands.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a) and (b).

6.      This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

## BASIS FOR FORFEITURE

8.      18 U.S.C. § 981(a)(1)(A) provides for the forfeiture of any property, real or personal, involved in a violation or attempted violation of 18 U.S.C. § 1956, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting a specified unlawful activity ("SUA"), as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such SUA. 18 U.S.C. § 1956(c)(7)(A) provides that any act or activity constituting an offense under 18 U.S.C. § 1961(1)

2

constitutes an SUA, with the exception of an act indictable under subchapter II of Chapter 53 of Title 31 of the United States Code. 18 U.S.C. § 1961(1) references violations of 18 U.S.C. § 1343.

## STATEMENT OF FACTS

10.      The Federal Bureau of Investigation ("FBI") seized the Defendant Property from criminals involved in investment fraud scams. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities and to recover assets that may be used to compensate victims.[1]

A.  Background on Cryptocurrency

11.      **Virtual Currency:** Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Bitcoin (or BTC) and Ethereum (ETH) are currently the most well-known virtual currencies in use. There is also a category of virtual currency called stablecoins, which is a type of virtual currency that is designed to maintain a stable value over time, usually by being pegged to a specific asset or basket of assets.

12.      **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

13.      **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

14.  **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue in this affidavit are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

15.  As discussed briefly above, wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains the private keys to a customer's wallet addresses and retains a customer's funds until the customer is ready to transact with those funds. Conversely, in "unhosted" wallets, the users retain the private keys to their wallets addresses which allows users to exercise total, independent control over their funds.

16.  **Blockchain**: The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

17.  **Blockchain Explorer:** These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API and blockchain nodes to draw

4

data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

18.    **Virtual Currency Exchanges ("VCEs"):** VCEs are trading and/or storage platforms for virtual currencies, such as BTC, ETH, etc. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

19.    **Virtual Currency Swap Service**: A virtual currency swap provides the user the ability to exchange virtual currency assets for their equivalent value in another coin or token. These swap services are usually publicly available online tools that allow users to easily conduct these swaps through the use of smart contracts.

20.    **Blockchain Analysis**: It is virtually impossible to look at a sole transaction on a blockchain and immediately ascertain the identity of the individual behind said transaction. That is because blockchain data generally only consists of alphanumeric strings and timestamps. That said, law enforcement can obtain leads regarding the identity of the owner of an address by analyzing blockchain data to figure out whether that same individual is connected to other relevant addresses on the blockchain. To do so, law enforcement can use blockchain explorers, as well as commercial services offered by several different blockchain-analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (i.e., a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools

and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020). Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable.

21.     **Nexo Capital:** Nexo Capital is a virtual currency exchange that allows users to deposit cryptocurrency to earn high-yield interest, take out crypto-backed loans, and buy/sell assets.

22.     **Flexible-Savings Wallet:** A wallet option available to customers of Nexo.  A Flexible-Savings Wallet earns daily compounding interest on the assets in the wallet, while still allowing customers to withdraw or trade their assets.  Interest payouts are paid daily.

23.     **Fixed-Term Wallet:** A wallet option available to customers of Nexo.  A Fixed-Term Wallet allows customers to lock their assets for a set term – one, three, six, or twelve months and earn a higher reward than Flexible-Savings Wallet.  Interest payouts are paid in one lump sum when the term ends.

24.     **Bitcoin ("BTC")**: Bitcoin (or "BTC") is a type of virtual currency. Unlike traditional, government-controlled currencies (i.e., fiat currencies), such as the U.S. dollar, Bitcoin is not managed or distributed by a centralized bank or entity. Because of that, Bitcoin can be traded without the need for intermediaries. Bitcoin transactions are approved/verified by computers running Bitcoin's software. Those computers are called network nodes. Each node uses cryptography to record every Bitcoin transaction on the Bitcoin blockchain. The Bitcoin blockchain is a public, distributed ledger. Bitcoin can be exchanged for fiat currency, other virtual currencies, products, and services.

9.     **Nexo tokens**: NEXO tokens are the virtual currency native to the Nexo virtual cryptocurrency exchange.

10.     **Ether ("ETH")**: Ether ("ETH") is a cryptocurrency that is open-source and is distributed on a platform that uses "smart contract" technology. Transactions involving ETH are publicly recorded on the Ethereum blockchain, which allows anyone to track the movement of ETH.

B.  The Scheme

22.     Victim-1 is an elderly resident of Loudoun County, Virginia who owned various types of cryptocurrencies in hosted wallets at three different Virtual Currency Exchanges: (1) Coinbase, (2) Nexo, and (3) Kraken.

23.     On or about January 24, 2022, Victim-1 tried to upgrade his Coinbase account from a standard account to a "pro" account. While trying to complete this upgrade, a chat box popped up on Victim-1's computer screen and Victim-1 began speaking with an individual he believed to be associated with Coinbase. Victim-1 explained to this individual that he was trying to upgrade his Coinbase account, and the individual promised to help him.

24.     Victim-1 then received a phone call from a male named "George" who said he was going to help him upgrade his account. "George" asked Victim-1 if he had any other cryptocurrency accounts and Victim-1 disclosed that he had accounts with Nexo and Kraken. "George" told Victim-1 that he would help him, but that Victim-1 must not shut down his computer or access his accounts until the upgrade was completed.

25.     On or about January 27, 2022, Victim-1 looked at his accounts at Coinbase, Nexo, and Kraken for the first time since conversing with "George" and discovered that his wallets at all three virtual currency exchanges had been drained. Cryptocurrency worth more than $2 million USD had been stolen from his accounts.

26.     Victim-1 did not know how the criminal actor(s) accessed his virtual currency exchange accounts.  He did not remember downloading any software and was adamant that he had not provided

his log in information to anyone. A forensic investigator analyzed Victim-1's computer and found that a remote desktop software was installed on his computer on or about January 24, 2022, during the period of his communications with "George." It is believed that this remote desktop software allowed the criminal actor(s) to access Victim-1's computer and subsequently Victim-1's virtual currency exchange accounts.

27.    After the theft, Victim-1 notified law enforcement and provided details of the unauthorized withdrawals from his VCE wallets.

28.    Over the course of multiple transactions occurring between on or about January 24 and 26, 2022, the criminal actor(s) withdrew 493.78 ETH from Victim-1's wallets and sent it to wallet address 0x5f28E999ce2693256eC468A791ee54f6CB1ae967 ("0x5f28"). Between on or about January 25 and 26, 2022, the criminal actor(s) withdrew 499.87 ETH from 0x5f28 and sent 337.13 ETH to wallet address 0x7d963166aE16E87105C0C4D323d4869f15499684 ("0x7d96"). On or about January 25, 2022, the criminal actor(s) sent 216.15 ETH from 0x7d96 to wallet address 0x9b46CA799a1a005168E33A16a03376166209Cd86 ("0x9b46") a wallet hosted by NEXO—a cryptocurrency exchange.  Of the 216.15 ETH sent from 0x7d96 to 0x9b46, 204 ETH is directly traceable to Victim-1's wallet address.

29.    Further, on or about January 26, 2022, the criminal actor(s) withdrew 35,026.89 NEXO from Victim-1's account and sent it to wallet address 0x831dcebe9c2ef4c1cd728d420506e8314cfd17ea ("0x831dce").  Just 11 minutes after that transaction, all 35,026.89 NEXO was withdrawn from 0x831dce and transferred to 0x9b46 – the same wallet address that received the 216.15 ETH discussed above. 0x9b46 is an address hosted by Nexo. In response to legal process, Nexo provided reports, photos, and copies of identification documents showing that this wallet address belongs to their customer, J.S.

30.     In addition to the ETH and NEXO transfers described above, on or about January 25, 2022, the criminal actor(s) withdrew 7.47 BTC from Victim-1's account and sent it to wallet address bc1qtzgpkp3mnqwsjzqh9vach7cr7mx8zdmvhpes7y ("bc1qtzg"). Later that afternoon, on or about January 25, 2022, bc1qtzg sent all 7.47 BTC to wallet address 3PXnvqFD7VehoeG1qa4xuQ89bL49kWVA3g ("3PXnvq"). 3PXnvq is an address hosted by Nexo. In response to legal process, Nexo provided reports, photos, and copies of identification documents showing that this wallet address belongs to their customer, J.S.

31.     Thus, out of the over $2 million USD worth of virtual currency that was stolen from wallets belonging to Victim-1, $880,818.98 USD worth of virtual currency was deposited into the Nexo hosted wallet addresses belonging to J.S.

32.     Aside from the two Nexo hosted wallet addresses belonging to J.S., additional connections appear from the wallet addresses that initially received Victim-1's cryptocurrency to J.S.'s Nexo wallet(s). As mentioned previously, 0x5f28 received 493.78 ETH directly from Victim-1's wallets. Of that 493.78 ETH, some was sent to 0x7d96 as previously explained, and another 162 ETH was sent to wallet address 0x08DDE0351c7D1f4CBB2859C5674a6Ee2b2901C03 ("0x08DD") on or about January 26 and 27, 2022 as well. 0x08DD was also the direct recipient of 149 ETH, 6,930.16 MATIC and 266,339.91 USDT from Victim-1's wallet addresses on or about January 24 and 25, 2022.

33.     The first deposits into J.S.'s Nexo wallet(s) was on or about January 4, 2022, less than three weeks prior to the theft of Victim-1's cryptocurrency. The two addresses that funded J.S.'s Nexo wallet(s) were 0x5f28 and 0x08DD.

34.     Furthermore, a day after J.S. received the 7.47 BTC from bc1qtzg in the transaction previously described, J.S. transferred 1.5 BTC from his wallet to bc1q8tx86plkyjjf2tu0z5lcjp5hrsmvzjs5eg9w79 ("bc1q8tx"). Blockchain analysis and clustering show

that: 1)bc1q8tx directly received 2.79 BTC from Victim-1 wallets on or about January 24, 2022; and

2)bc1qtzg and bc1q8tx are likely controlled by the same individual. Further transaction analysis shows

that J.S. received 8.94 BTC on or about  January 21, 2022, just a few days before receiving Victim-1's

stolen BTC. Blockchain clustering indicates that the 8 different wallet addresses that sent the 8.94 BTC

to J.S. are likely controlled by the same individual controlling wallet addresses bc1qtzg and bc1q8tx.

35.    In summary, 7.47 BTC, 204 ETH, and 35,044.62 NEXO Victim-1's stolen

cryptocurrency was deposited into J.S.'s Nexo wallet(s). Analysis of the transactions within his wallet(s)

indicate a direct connection to the three addresses that received almost all of Victim- 1's stolen

cryptocurrency (0x5f28, 0x831dce and bc1qtzg) in the initial transactions directly involving Victim-1's

wallets.

36.    Per Nexo, J.S. owns the following deposit addresses:

a)  **3PXnvqFD7VehoeG1qa4xuQ89bL49kWVA3g; and**

b)  **0x9b46ca799a1a005168e33a16a03376166209cd86.**

J.S. received multiple USDT, USDC, ETH, and BTC deposits into his deposit addresses prior to

receiving Victim-1's stolen cryptocurrency. Victim-1's BTC was subsequently transferred to J.S.'s

3PXnvq address, that was already holding 8.9 BTC, and Victim-1's ETH and NEXO were deposited

into J.S.'s 0x9b46 address, which already held approximately 2,648 NEXO and 59 ETH.

37.    Prior to receiving Victim-1's 35,026389 NEXO, J.S. had approximately 96.37 NEXO in

the account.  The 96.37 NEXO came from a combination of swapping some USDT and ETH  to NEXO

as well as earning daily interest, paid out in NEXO tokens, from the assets in the Flexible-Savings

Wallet.  This included earning approximately 7.27 NEXO and 8.79 NEXO from Victim-1's ETH and

BTC that was deposited into the account.

22.     After receiving Victim-1's ETH, BTC, and NEXO on or about January 25, 26, and 27, 2022, respectively, all the ETH, BTC, and NEXO in J.S.'s Nexo wallet were transferred to a "Term Wallet." This transfer included not only Victim-1's ETH, BTC, and NEXO but all of the cryptocurrency that had been deposited into the wallet up to that point. After being held in the Term Wallet for a month, the cryptocurrencies were transferred into a Savings Wallet, at which point the interest accrued was deposited into the Savings Wallet as a lump sum. Once Nexo deposited the earned interest, all the ETH, BTC and NEXO in J.S.'s Savings Wallet were moved back into a Term Wallet for another month, at which point the cycle started over again.  These transfers occurred monthly from in and around January 2022 to in and around March 2023.

23.     J.S. continued this pattern of locking the BTC and ETH for one-month periods in a Fixed-Term Wallet to earn a higher interest payment, which was paid in NEXO tokens. In total, J.S. earned an additional 32,731.73 NEXO tokens from his Fixed-Term Wallet interest payments and an additional 2297.76 NEXO tokens from his Flexible-Savings Wallet interest payments (after receiving Victim-1's BTC, NEXO, and ETH).

24.     Below is a visual representation of the movement of the victim's funds.



25.     There is no reason, economic or otherwise, for legitimate business or individuals to

conduct cryptocurrency transfers in the above fashion.  Each individual cryptocurrency transfer costs

money.  Businesses and individuals who simply seek to transfer legitimate funds from one address to another stive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible.

26.     The large number of transactions in a short amount of time indicate that the motivation behind the transactions is to conceal the nature, origin, location, control, and ownership of the funds.

27.     Ultimately, the Federal Bureau of Investigation obtained a lawful seizure warrant for a portion of the contents of the 9cd86 wallet.

28.     On or about on May 31, 2023, Nexo confirmed that they froze the Defendant Property; specifically, 106.84634525 ETH, and 72,744.25201403 NEXO in J.S.'s Nexo account.  All 106.84634525 ETH is 100% traceable to Victim-1.  Out of the 72,744.25 NEXO in J.S.'s Nexo account, 35,026.89 is traceable to Victim-1.  However, all 72,744.25 NEXO is involved in money laundering because the non-traceable portion of the NEXO served to conceal the 35,026.89 in wire fraud proceeds belonging to Victim-1.

## FIRST CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. § 981(a)(1)(A))

29.     The United States incorporates by reference paragraphs 1 – 28 above as if fully set forth herein.

30.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title, or any property traceable to such property."

31.     Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal liability on "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in

fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

32.    As set forth above, the Defendant Property constitutes property involved in a violation of section 1956(a)(1)(B)(i).

33.    As such, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

<b>SECOND CLAIM FOR RELIEF</b><br>(Forfeiture under 18 U.S.C. § 981(a)(1)(C))

34.    The United States incorporates by reference paragraphs 1 – 28 above as if fully set forth herein.

35.    Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section n1956(c)(7) of this title) or a conspiracy to commit such offense."

36.    Title 18, United States Code, Section 1956(c)(7)(D) provides that the term "specified unlawful activity" includes "an offense under . . . section 1343 (relating to wire fraud)."

37.    As set forth above, the Defendant Funds constitute criminal proceeds of the wire fraud scheme.

38.    As such, the Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

<b>PRAYER FOR RELIEF</b>

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the Defendant Property and that due notice be given to all interested parties to appear and show cause why

14

said forfeiture of the Defendant Property should not be decreed, that the Defendant Property be

condemned and forfeited to the United States to be disposed of according to law, and for such other and

further relief as this Honorable Court may deem just and proper.

DATED this 14th day of June 2026

Respectfully submitted,

TODD W. BLANCHE
ACTING ATTORNEY GENERAL

By:          /s/
             Annie Zanobini
             Assistant United States Attorney
             California Bar No. 321324
             2100 Jamieson Avenue
             Alexandria, Virginia 22314
             Office Number: (703) 299-3903
             Facsimile Number: (703) 299-3982
             Email Address: annie.zanobini2@usdoj.gov

15

## VERIFICATION

I, Shannon Almberg, Task Force Officer with the Federal Bureau of Investigation, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture in Rem is based on information known by me personally and/or furnished to me by various federal, state, and local law enforcement agencies, and that everything contained herein is true and correct to the best of my knowledge.

Executed at _Leesburg_, Virginia, this __12th__ of June, 2026

Shannon Almberg, Task Force Officer
Federal Bureau of Investigation

16